

JUDGE BAER



REED SMITH LLP
Peter D. Raymond (PR 3029)
Wallace B. Neel (WN 0038)
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*M. Shanken Communications, Inc.*

RECEIVED
OCT 12 2007
U.S.D.C. S.D.N.Y.
CASHIERS

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| M. SHANKEN COMMUNICATIONS, INC., : | No. _____ |
| Plaintiff : | |
| -against- : | **COMPLAINT** |
| P4 PERFORMANCE MANAGEMENT, INC., ANTHONY POMPLIANO JR., VIVIAN ONELLO, AND STEVE MORTIBOY, : | |
| Defendants. : | |

Plaintiff M. Shanken Communications, Inc. ("Shanken"), by its attorneys Reed Smith

LLP, for its Complaint against defendants P4 Performance Management, Inc. ("P4"), Anthony

Pompliano, Jr. ("Pompliano"), Vivian Onello ("Onello"), and Steve Mortiboy ("Mortiboy")

(together, "Defendants" and each a "Defendant"), alleges as follows:

### NATURE OF ACTION

1.       This action arises from extortion and fraud committed by Defendant P4 and

certain of its officers and managers.  Defendant P4 formerly managed the computer web servers

for Shanken's lucrative web sites at *www.winespectator.com*, *www.cigaraficionado.com*,

www.winespectatorschool.com and www.foodarts.com (the "Web Sites").  When Shanken

informed P4 that Shanken would not renew the management contract when it expired at the end

of September 2007, the Defendants conspired to misappropriate control of Shanken's Web Sites

by unilaterally changing the access passwords needed to access the servers and then holding

those passwords hostage in an attempt to force Shanken to make ransom payments to P4 or to

renew the management contract.  Moreover, when Shanken was forced to succumb to P4's

extortionate demands and paid the initial ransom to get back control of its Web Sites, P4 refused

to comply with its own false promises.  Instead, P4 took Shanken's money but retained control of

Shanken's Web Sites and made further ransom demands in exchange for the promised release of

the passwords.  Without access to, and thus any ability to control, the content of its Web Sites,

Shanken had no choice but to disconnect its Web Sites from the Internet.

     2.      As a result of Defendants' illegal conduct, which violated, among other things,

federal, New York and Virginia computer crimes and fraud statutes, Shanken's Web Sites were

off-line for five days, which caused significant damage to Shanken's reputation with its loyal

customers and others, substantial lost revenues from advertisers and consumers and substantial

expenses incurred in trying to regain control of its Web Sites and restore them to the Internet.

### JURISDICTION AND VENUE

     3.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. §§ 1331, 1332 and 1367.  The amount in controversy exceeds $75,000, exclusive of costs

and interest.

     4.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C.

§ 1391 (a)(2), (b) and (c), because the defendant corporation is subject to personal jurisdiction in

this district and because a substantial portion of the events or acts complained of occurred within

this District.

## PARTIES

5.      Plaintiff Shanken is a New York corporation with its principal place of business at 387 Park Avenue South, New York, New York, 10016.  Shanken is a publishing and communications company which publishes, among others, *Wine Spectator* and *Cigar Aficionado* magazines.

6.      Upon information and belief, Defendant P4 is a Delaware corporation with its principal place of business at 105 Brooks Avenue, Raleigh, North Carolina, 27607.  Upon information and belief, Defendant P4 is in the business of providing management and support services for companies with Internet web servers.

7.      Defendant Pompliano is the Chief Executive Officer of P4.  Upon information and belief, Defendant Pompliano a resident of North Carolina.

8.      Defendant Onello is a Regional Sales Manager at P4 with whom Shanken interacted.  Upon information and belief, Defendant Onello is a resident of North Carolina.

9.      Defendant Mortiboy is the Operations Manager at P4.  Upon information and belief, Defendant Mortiboy is a resident of North Carolina.

## FACTUAL BACKGROUND

10.      The magazines *Wine Spectator* and *Cigar Aficionado* are two of Shanken's most popular publications, and they have built strong reputations as authoritative sources of information for consumers interested in the epicurean lifestyle, including oenophiles and cigar enthusiasts.

11.      Through the investment of substantial time and money, Shanken has also developed highly-successful online compliments to each of those magazines.  Shanken's web sites at *www.winespectator.com, www.cigaraficionado.com, www.winespectatorschool.com* and

*www.foodarts.com* (together, the "Shanken Web Sites") have become recognized as valuable resources for Shanken's readers. Shanken also derives substantial revenue from the Shanken Web Sites through, among other things, paid subscriptions to many of the Web Sites, sales of goods and magazine subscriptions, sales of tickets for Shanken events and the sale of advertising.

## A.  The Master Services Agreement

12.     On or about October 25, 2001, Shanken entered into a "Master Services Agreement" with defendant P4's predecessor "SiteSmith, Inc., which is the legal entity for the Internet Services Business Unit of Metromedia Fiber Network, Inc., which also includes AboveNet Communications" (hereinafter referred to as "AboveNet"). Under the Master Services Agreement, AboveNet was to provide "Managed Services" for Shanken's computer servers (the "Shanken Web Servers") which controlled the Shanken Web Sites. These Managed Services included administering, maintaining and monitoring the Shanken Web Servers, which Shanken housed in a climate controlled environment in Virginia. A copy of Master Services Agreement is annexed as Exhibit A.

13.     In order to have exclusive access to provide the necessary services for the Shanken Web Servers, AboveNet created and maintained usernames and passwords (the "Access Passwords") which were needed to access the Shanken Web Servers. Only AboveNet (and its successors) and Shanken had these usernames and passwords.

14.     AboveNet did not control the content of the Shanken Web Sites. Shanken's own employees provided and revised the content of the Shanken Web Sites by remotely accessing the Web Servers to upload, download, or otherwise access and revise data on the Shanken Web Sites. For such remote access to the Shanken Web Servers, Shanken employees needed the Access Passwords, which AboveNet supplied to Shanken.

15.    On or about April 28, 2003, Shanken renewed its Master Services Agreement with AboveNet for two (2) years by signing an "Order Form" with AboveNet. A copy of the Order Form is annexed as Exhibit B.

16.    In or around June 2003, Defendant P4 informed Shanken that it had began providing services to Shanken on AboveNet's behalf, "as a private label provider to AboveNet Communications."

17.    On or about June 29, 2005, Shanken signed another renewal of the Master Services Agreement with "AboveNet Communications, Inc., (f/k/a Metromedia Fiber Network Services, Inc.)" (the "2005 Agreement"). The 2005 Agreement expressly renewed the terms of the existing agreement for two (2) years through June 29, 2007. A copy of the 2005 Agreement is annexed as Exhibit C.

18.    On February 21, 2006, Defendant P4 advised Shanken in writing that it had assumed all of AboveNet's responsibilities and obligations under the 2005 Agreement to, *inter alia,* administer, maintain and monitor the Shanken Web Servers. P4 also advised Shanken that it had been providing these services for two years as agent for AboveNet. On this basis, Shanken signed the proposal (on February 23, 2006) and agreed to accept P4 as AboveNet's successor and assignee under the 2005 Agreement. A copy of the February 21, 2006 assignment is annexed as Exhibit D.

19.    In or around June 2007, when the 2005 Agreement was about to expire, Shanken decided that it did not want to renew the agreement with P4 for another two-year term. Instead, Shanken offered to enter into a month to month agreement with P4.

20.    P4 responded that the shortest renewal term it would offer was three months. Shanken agreed to this and, on June 29, 2007, Shanken and P4 entered into an extension of the

Master Services Agreement to September 30, 2007 (the "Three Month Contract"). A copy of the Three Month Contract and P4's summary of its services under the Contract is annexed as Exhibit E.

**B.  P4's Illegal Actions**

21.    On August 30, 2007, when the Three Month Contract was approaching its September 30, 2007 expiration date, Shanken delivered a letter to P4 informing it that Shanken had determined not to renew the Three Month Contract and to cease using P4 as its web server manager when the Three Month Contract expired at the end of September. A copy of the August 31, 2007 letter is annexed as Exhibit F.

22.    Defendants' response to Shanken's letter was to unilaterally change the usernames and passwords which are needed to access the Web Servers that support Shanken's Web Sites. The new usernames and passwords created by Defendants will hereinafter be called the "New Access Passwords." Defendants made these changes on Monday, September 10, 2007, without permission from Shanken or even notice to Shanken. After changing the Access Passwords, Defendants refused to disclose the New Access Passwords to Shanken, with the result that Shanken had no way to update or change the content of the Web Sites.

23.    On September 10, 2007, Defendant Onello made a demand that Shanken pay P4 $2,100 which was the disputed portion of a bill from P4. Shanken had already paid the $9,712.50 balance of the bill.

24.    Later in the day on Monday, September 10, when its employees attempted to access the Web Servers to remotely update data and content to the Shanken Web Sites, Shanken discovered that Defendants had secretly changed the Access Passwords. As a result, Shanken's employees could not exercise control over the Shanken Web Sites.

25.    The following day, Tuesday, September 11, 2007, Shanken vehemently protested Defendants' actions in changing the Access Passwords and denying Shanken access to the Shanken Web Sites.  Shanken also demanded to be given the New Access Passwords created by Defendants so Shanken could access the Shanken Web Sites.

26.    Defendants responded to Shanken's demand by representing that it would restore some of the passwords, but only after Shanken paid P4 the $2,100 balance it claimed Shanken owed and made immediate payment of the invoices for $23,656 billed by P4 which were not yet even due.

27.    These monetary demands made by Defendants, after kidnapping Shanken's access to the Shanken Web Servers, were extortionate and had no basis whatsoever in the Three Month Contract.  However, faced with the choice of either paying the ransom Defendants demanded or continuing to be disabled from control over the Shanken Web Sites which were its critical web-based interface with its customers and potential customers, Shanken wired P4 all funds demanded at noon on September 11.

28.    Later that day, Defendants gave Shanken some of the New Access Passwords (the "Vignette Passwords").  However, Defendants still refused, in violation of their own ransom demand, to release the Oracle and "root" New Access Passwords which were necessary for Shanken to access the Shanken Web Servers and control the Shanken Web Sites.

29.    On the morning of Wednesday, September 12, 2007, Shanken's Executive Vice President, Mel Mannion, demanded release of all the New Access Passwords by email and voicemail from both Defendant Onello and Defendant Pompliano.  Ms. Mannion received no response.  Therefore, on the evening of September 12, Shanken's chief of technology, David VanHook, demanded the New Access Passwords from Defendant Mortiboy, P4's Operations

Manager, but Defendant Mortiboy told Mr. VanHook that he had been instructed not to give

Shanken the new root passwords and the new Oracle passwords Defendants had created.

30.    On the evening of Thursday, September 13, Defendant Onello called Mel

Mannion and told her that P4 had no obligation to release the New Access Passwords to

Shanken. Defendant Onello again resorted to extortion and informed Shanken that Shanken

would only get the New Access Passwords if it canceled its contract with Savvis (Shanken's new

Web Site management company) and renewed its Master Services Agreement with P4.

31.    Faced with this outrageous threat, Shanken decided it had to attempt to "break

into" its own Web Servers and take back control of the Web Sites from Defendants. However,

without the New Access Passwords that were held for ransom by Defendants, Shanken failed to

gain control of its own Web Servers.

32.    Although unable to get control of the Shanken Web Servers without the new

passwords, Shanken's information technology personnel were able to reset the firewall

usernames and passwords, and, thereby block Defendants from accessing Shanken's Web Sites

and doing any further damage to the Shanken Web Sites.

33.    The following day, Friday, September 14, 2007, Defendants put their extortionate

threats in writing. Defendant Onello delivered a letter to Shanken offering three "options" to

Shanken. The first option offered was for Shanken to pay $5,000 to P4 to "restore existing

services". The second option was for Shanken to renew its contract with P4 (which had been at

$23,435 per month), in which case P4 would waive the $5,000 "restoration" fee in option one.

The last option was for P4 to arrange for an "orderly transfer" of control of Shanken's Web

Servers to Shanken in exchange for an additional ransom payment from Shanken of $69,000. A

copy of Defendant Onello's September 14, 2007 letter is annexed as Exhibit G.

34.     With a gun to its head, Shanken chose option one and immediately wired $5,000 to P4 to get its Web Servers restored.

35.     P4 took the money.  However, P4 failed to restore the Web Servers as P4 had promised.  Instead, to Shanken's shock, P4 demanded that Shanken provide P4 with the firewall passwords that Shanken's information technology personnel had been able to change on Thursday, September 13, to deny access to Defendants.  Shanken, of course, refused to give back to P4 complete access and control of the Shanken Web Sites.

36.     When Defendants refused to provide Shanken with the passwords even after Shanken had paid both the $5,000 ransom that Defendants demanded and the earlier ransom of $25,751, Shanken had only one option: to disconnect its Web Sites from the Internet altogether, which it did on the evening of Friday, September 14.

37.     With its Web Sites off-line, Shanken's technology staff immediately started to work on its own restoration of the Shanken Web Sites without the New Access Passwords.  However, it took Shanken five days to restore its Shanken Web Servers and get its valuable *www.winespectator.com, www.cigaraficionado.com, www.winespectatorschool.com* and *www.foodarts.com* Web Sites back online.

38.     During the days that the Shanken Web Sites were disabled, Shanken received numerous communications from Web Site subscribers complaining about the Web Sites being inaccessible and accusing Shanken of a lack of concern for its customers and poor business judgment.  Copies of representative emails are annexed as Exhibit H.  Shanken also lost substantial revenues due to lost sales, lost advertising revenue and the significant expenses incurred in reestablishing the Shanken Web Sites including the running of full page advertisements in the newspapers.  Shanken was also forced to credit subscribers who were cut

off from the Web Sites to which they had subscribed. Finally, Shanken suffered severe damage to its reputation with its loyal customers and others. All of these losses directly resulted from Defendants' illegal actions.

## FIRST CLAIM

**(FEDERAL COMPUTER CRIMES AND FRAUD ACT, 18 U.S.C. § 1030(g))**
**(Against All Defendants)**

39.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

40.    The Shanken Web Servers are protected computers within the meaning of the Computer Crimes and Fraud Act, 18 U.S.C. § 1030.

41.    Defendants knowingly or recklessly caused the transmission of a program(s), information, code(s), or command(s) to the Shanken Web Servers.

42.    As a result of Defendants' transmission of such program(s), information, code(s), or command(s), Defendants impaired the integrity and/or availability of data, a program, a system, or information. Defendants' transmission of such program(s), information, code(s), or command(s) therefore caused damage to the Shanken Web Servers.

43.    Defendants' transmission of such program(s), information, code(s), or command(s) caused loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value.

44.    Defendants caused the transmission of a program(s), information, code(s), or command(s) to, and caused damage to, the Shanken Web Servers without authorization.

45.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

46.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

## SECOND CLAIM

### (FEDERAL COMPUTER CRIMES AND FRAUD ACT, 18 U.S.C. § 1030)
### (Against All Defendants)

47.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

48.    The Shanken Web Servers are protected computers within the meaning of the Computer Crimes and Fraud Act, 18 U.S.C. § 1030.

49.    Defendants knowingly and with intent to defraud trafficked in a password or similar information through which a computer may be accessed without authorization in a manner affecting interstate or foreign commerce.

50.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

51.    Defendants' trafficking in such manner caused loss to 1 (one) or more persons during any 1-year period aggregating at least $5,000 in value.

52.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

## THIRD CLAIM

### (FEDERAL COMPUTER CRIMES AND FRAUD ACT, 18 U.S.C. § 1030)
### (Against All Defendants)

53.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

54.     The Shanken Web Servers are protected computers within the meaning of the Computer Crimes and Fraud Act, 18 U.S.C. § 1030.

55.     Defendants, with intent to extort money or other thing of value from Shanken, transmitted in interstate or foreign commerce a communication containing a threat to cause damage to the Shanken Web Servers.

56.     All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

57.     Defendants' transmission of such communication caused loss to 1 or more persons during any 1-year period aggregating at least $5,000 in value.

58.     By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

## FOURTH CLAIM

### (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)
### (Against Defendant P4)

59.     Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

60.     By attempting to extort money and/or additional business from Shanken in exchange for the New Access Passwords, P4 breached the covenant of good faith and fair dealing inherent in the contract between the parties.

61.     P4's breach of the contract between the parties is actionable as an independent tort.

62.     P4's conduct is of an egregious nature sufficient to qualify independently for punitive damages on tort grounds.

63.     P4's conduct was directed at Shanken.

64.     P4's conduct is part of a pattern that is directed at the public generally.

65.     By reason of the foregoing, and as a direct and proximate result of P4's conduct, Shanken is entitled to compensatory damages.

66.     As a direct and proximate result of P4's willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

## FIFTH CLAIM

### (ECONOMIC DURESS)
### (Against Defendant P4)

67.     Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

68.     P4 wrongfully threatened to withhold Shanken's rightful access to the Shanken Web Servers unless Shanken paid P4 sums of money to which P4 was not entitled.

69.     P4's ransoming of Shanken's property in this manner deprived Shanken of its ability to exercise free will.

70.     Shanken has been damaged in the amount of those payments.

71.     Shanken is entitled to the return of all monies paid under said economic duress.

## SIXTH CLAIM

### (TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONS)
### (Against All Defendants)

72.     Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

73.     Shanken maintains substantial business relations with its online customers, readers, and advertisers.

74.    Defendants' actions described above rendered the Shanken Web Sites unusable for several days.

75.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

76.    Defendants' conduct was intended to and did interfere with Shanken's relationships with its online customers, readers, and advertisers.

77.    Defendants have intentionally, maliciously, and without justification interfered with Shanken's future business relations with its online customers, readers, and advertisers.

78.    Defendants' actions were undertaken with the sole purpose of harassing Shanken and/or were undertaken by dishonest, unfair, or improper means.

79.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

80.    As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

## SEVENTH CLAIM

### (CIVIL RECOVERY FOR CRIMINAL VIOLATION OF NEW YORK PENAL LAW § 156.10)
### (Against All Defendants)

81.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

82.    Defendants knowingly used, caused to be used, or accessed a computer, computer service, or computer network without authorization.

83.    Defendants took such action with the intent to commit or attempt to commit or further the commission of a felony.

84.    Defendants took such action and thereby knowingly gained access to computer material.

85.    Defendants' actions in this regard constitute a violation of criminal law pursuant to New York Penal Law § 156.10.

86.    All Defendants acted in concert pursuant to an agreement to take such unlawful action.

87.    Shanken is one for whose benefit that criminal statute was enacted.

88.    The allowance of a private right of action pursuant to New York Penal Law Section 156.10 will clearly further the legislative purpose of deterring computer trespass.

89.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

90.    As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

### EIGHTH CLAIM

**(CIVIL RECOVERY FOR CRIMINAL VIOLATION OF
NEW YORK PENAL LAW § 156.20)
(Against All Defendants)**

91.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

92.    Defendants used, caused to be used, or accessed the Shanken Web Servers and/or another computer, a computer service, or a computer network without authorization.

93.    Defendants intentionally altered or destroyed Shanken's computer data or a computer program.

- 15 -

94.     Defendants' conduct in this regard violated New York criminal law pursuant to Penal Law § 156.20.

95.     All Defendants acted in concert pursuant to an agreement to take such unlawful action.

96.     Shanken is one for whose benefit that criminal statute was enacted

97.     The allowance of a private right of action pursuant to New York Penal Law Section 156.10 will clearly further the legislative purpose of deterring computer trespass.

98.     By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

99.     As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

## NINTH CLAIM

### (CIVIL RECOVERY FOR CRIMINAL VIOLATION OF VIRGINIA CODE § 18.2-152.3) (Against All Defendants)

100.     Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

101.     The Shanken Web Servers, which are part of a computer network, are situated in Virginia.

102.     Defendants used the Shanken Web Servers and/or a computer network to obtain property or services by false pretenses.

103.     Defendants used the Shanken Web Servers and/or a computer network to embezzle or commit larceny of Shanken's computer data, programs, software, and/or services.

104.    Defendants used the Shanken Web Servers and/or a computer network to convert Shanken's property.

105.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

106.    Defendants' use of the Shanken Web Servers and/or a computer network was conducted without authority to do so.

107.    Defendants' conduct in this regard constituted a criminal violation of Virginia law pursuant to Virginia Code § 18.2-152.3.

108.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken's sustained injury, including without limitation lost profits.

109.    Shanken has also been injured by the incurrence of the costs of this lawsuit, which are recoverable under Virginia Code § 18.2-152.12.

## TENTH CLAIM

### (CIVIL RECOVERY FOR CRIMINAL VIOLATION OF VIRGINIA CODE § 18.2-152.4) (Against All Defendants)

110.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

111.    Defendants temporarily or permanently removed, halted, and/or otherwise disabled computer data, computer programs, or computer software from the Shanken Web Servers or other computers or a computer network.

112.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

113.    Defendants performed each of those actions with malicious intent.

114.    Defendants' conduct in this regard constituted a criminal violation of Virginia law pursuant to Virginia Code § 18.2-152.4.

115.    As a result of Defendants' conduct, Shanken's sustained injury including without limitation lost profits

116.    Shanken is also entitled to recover the costs of this lawsuit, including its reasonable attorneys' fees, under Virginia Code § 18.2-152.12.

## ELEVENTH CLAIM

### (PRIMA FACIE TORT)
### (Against All Defendants)

117.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

118.    Defendants' conduct as set forth herein was completely unjustified and was intended to inflict substantial harm on Shanken.

119.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

120.    As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

## TWELFTH CLAIM

### (FRAUD)
### (Against All Defendants)

121.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

122.    Onello, on behalf of Defendants, falsely represented to Shanken that if Shanken paid P4 $2,100 on a disputed invoice as well as the full amount of two as-yet-undue invoices, P4 would provide Shanken with the New Access Passwords.

123.    Onello's representation on behalf of Defendants was a false representation of a material fact.

124.    Onello made that false representation on behalf of Defendants with the intent to deceive Shanken into relying on it.

125.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

126.    Shanken did, in fact, rely on that false representation.

127.    Shanken's reliance on that false representation was reasonable.

128.    Shanken in fact paid P4 the full amount of the disputed $2,100.00 as well as the full amount of two as-yet-undue invoices.

129.    Despite that payment, P4 refused to provide Shanken with the New Access Passwords.

130.    Shanken's reasonable reliance caused injury to Shanken.

131.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

132.    As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

## THIRTEENTH CLAIM

### (FRAUD)
### (Against All Defendants)

133.    Shanken realleges all preceding paragraphs of this Complaint as though fully set forth herein.

134.    Onello, on behalf of Defendants, falsely represented to Shanken that P4 would "restore existing services" if Shanken paid P4 $5,000.

135.    Onello's representation on behalf of Defendants was a false representation of a material fact.

136.    Onello made that false representation on behalf of Defendants with the intent to deceive Shanken into relying on it.

137.    All Defendants acted in concert pursuant to an agreement to take such unlawful actions.

138.    Shanken did, in fact, rely on that false representation.

139.    Shanken's reliance on that false representation was reasonable.

140.    Shanken in fact paid P4 the $5,000.00.

141.    Despite that payment, P4 refused to "restore existing services."

142.    Shanken's reasonable reliance caused injury to Shanken.

143.    By reason of the foregoing, and as a direct and proximate result of Defendants' conduct, Shanken is entitled to compensatory damages.

144.    As a direct and proximate result of Defendants' willful, wanton, and egregious conduct, Shanken is entitled to punitive damages.

**WHEREFORE,** Shanken demands that judgment thereon be rendered:

A.      Against all Defendants jointly and severally for all actual damages suffered by Shanken as a result of Defendants' conduct in violation of federal or state statutes;

B.      Against P4 for all damages caused by the breach of the covenant of good faith and fair dealing and economic duress;

C.      Against P4 for the return of all monies extorted from Shanken under economic duress;

D.      Against all Defendants jointly and severally for an award of costs in this action, including reasonable attorneys' fees and expenses, as provided under Virginia Code Section § 18.2-152.12;

E.      Against all Defendants jointly and severally for punitive damages; and

F.      For such other and further relief as this Court deems just and proper.

Dated: New York, New York
       October 11, 2007

REED SMITH LLP

By: _____
       Peter D. Raymond (PR 3029)
       Wallace B. Neel (WN 0038)
599 Lexington Avenue
New York, New York 10022
(212) 521-5400

*Attorneys for Plaintiff*
*M. Shanken Communications, Inc.*

**EXHIBIT A**

Case 1:07-cv-08820-HB FILE    Document 5     Filed 10/12/2007    Page 23 of 30

SEP 18 2007 5:12:48PM HP LASER     SITESMITH, INC.     NO 458    P 2/13
Oct 29 01 05:19p     Stefanie Cox     7037980200     p.4
OCT-25-01 16:08 FROM:     ID:     PAGE    4

**Internet Services**
**Master Services Agreement**

This Internet Services Agreement (the "Agreement") is between the Customer named below and SiteSmith, Inc., which is the legal entity for the Internet Services Business Unit of Metromedia Fiber Network, Inc., which also includes AboveNet Communications, and is referred to below as "MFN". This Agreement may be executed by facsimile and/or in multiple counterparts. Once executed by both parties, this Agreement is effective as of the Effective Date shown below.

CUSTOMER: H Shanken Communications Inc.          SiteSmith, Inc.

Authorized
signature: _Mel Mannon_               Authorized
                                      signature: _KO'R_

(print name): _Mel Mannon_            (print name): _Adam Glick_

Title: _Executive Vice President_     Title: _Sr. Corporate Counsel_

Company
address: _387 Park Ave South_         MFN Customer ID# _# 354_

_NY, NY  10016_                       MFN Contract No. _# 354A_

Telephone: _212 684 4224_
Facsimile: _212 684 0608_             Effective Date: _10-23-01_

DOCUMENTS ATTACHED AND INCORPORATED BY REFERENCE: (check as applicable)

Service Order(s):
    [ ] Initial Service Order
    (Additional Service Orders referencing this Agreement will become a part of this agreement when fully executed.)

Addendum for AboveNet Co-location, Transit or Virtual ISX:
    [X] AboveNet Co-location: AboveNet Co-location Terms and AboveNet Bandwidth Terms
    [ ] AboveNet Virtual ISX: AboveNet Bandwidth Terms and AboveNet Virtual ISX Terms
    [ ] AboveNet Transit: AboveNet Bandwidth Terms

Service Level Agreement (SLA):
    [ ] SLA for Managed Services (if Customer has ordered Managed Services and satisfies the requirements of the SLA for Managed Services)
    [ ] SLA for ISX Services (for AboveNet Co-location without Managed Services (or with Managed Services but not meeting the requirements of the SLA for Managed Services), or AboveNet Virtual ISX or AboveNet Transit)

As used in this Agreement:

"Services" means the services ordered by Customer on one or more Service Orders.

"Service Order" means the documents signed by the parties and incorporated herein by reference, setting forth the specific services to be provided, the term of service, the prices and payment schedule, and any other provisions upon which the parties mutually agree. All Service Orders will be subject to the terms and conditions of this Agreement.

"ISX Services" means the provision of AboveNet Co-location Space and /or bandwidth on the AboveNet Network.

"Managed Services" means services related to management of Internet site infrastructure.

"AboveNet Co-location Space" means the physical area within a co-location facility owned or controlled by MFN as identified on an applicable Service Order.

"AboveNet Network" means the network of routers, switches and communication channels owned or controlled by MFN.

Additional terms are defined below.

**1. Fees And Billing.**

1.1 Service Charges. Customer agrees to pay the monthly charges for Services and any set up and other charges indicated on the Service Order(s) or otherwise due hereunder (collectively, "Service Charges"). Service Charges do not include any applicable taxes, which may be billed to Customer in addition to the Service Charges. If a Service Order provides for deferred payment of set-up costs over time, Customer acknowledges that it is responsible for paying in full the

MShanken(final)(v).0MShankonv4.0
MSA 01 6-12                                    1

remaining balance of such set-up costs in the event of any early termination of the Service Order or this Agreement for any reason whatsoever.

1.2 "Burst" Bandwidth. Billing for connectivity beyond the committed level ("burst" bandwidth) will follow the "95th percentile" rule: Usage samples will be collected and sorted from highest to lowest and the top 5% discarded. The next highest sample (the 95th percentile number) will then be used as the basis in computing the charge for the month for bandwidth beyond the committed level.

1.3 Billing and Payment Terms. Beginning on the date of commencement of the Services, as set forth in the Service Order or otherwise documented, Customer will be billed monthly in advance for the contracted Services; except for specified one-time additional Services ordered by Customer and for "burst" bandwidth, which will be billed after the end of the month. All Service Charges and other fees will be due in U.S. dollars within thirty (30) days of the date of invoice, or on such other terms as MFN may require if Customer has not met the criteria for an unsecured net-30-day line of credit. Late payments will accrue interest at a rate of one and one-half percent (1.5%) per month or the highest rate allowed by applicable law, whichever is lower. If Customer fails to make payments when due and does not cure such failure pursuant to the terms hereof, MFN may require payment in advance of further Services.

2. Services. The Services will be provided to Customer on the terms set forth on the Service Order(s), subject to the provisions of this Agreement. Requests for additional Services may be made to MFN's sales staff or by e-mail to contracts@abovenet.com and will be effective when accepted by MFN. Such additional Services shall result in an increase in the Service Charges as set forth in the Service Order. For additional services outside the scope of this Agreement (including any Service Order), MFN must receive 72 hours advance notice before commencing such services, or may bill Customer a $500 rush service charge.

3. Equipment.

3.1 Equipment Sales. If any Service Order includes the sale of equipment to Customer (including hardware, software, or other equipment), Customer agrees to pay the prices specified in the Service Order plus all applicable taxes, import and custom duties, and similar charges, upon the terms set forth herein. All risk of loss or damage to such equipment passes to Customer upon installation to Customer's data center space or such other point designated in the Service Order. Title passes to Customer when all outstanding balances due for such equipment are paid in full. In the event Customer defaults on its payment obligations hereunder, MFN may enter the premises wherein the equipment may be found and take possession and remove such equipment.

3.2 MFN-Supplied Equipment. Customer shall have no right or interest in any MFN-supplied equipment other than the right to use such equipment during the specified term while payments are current. Customer shall be liable to MFN for any damage to such equipment caused by Customer or Customer's representatives, agents or employees.

4. Warranty. MFN warrants that it will provide the Services at a professional level of quality conforming to generally accepted industry standards and in compliance with all applicable laws and regulations, EXCEPT AS SPECIFICALLY SET FORTH HEREIN, CUSTOMER'S USE OF THE SERVICES ARE AT CUSTOMER'S OWN RISK, AND MFN DOES NOT MAKE, AND HEREBY DISCLAIMS, ANY AND ALL OTHER EXPRESS AND IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT AND TITLE, AND ANY WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE, OR TRADE PRACTICE. EXCEPT AS SPECIFICALLY SET FORTH HEREIN, THERE IS NO WARRANTY THAT THE SERVICES WILL BE UNINTERRUPTED, ERROR-FREE, OR COMPLETELY SECURE.

5. Disclaimer of Third Party Actions and Control. MFN does not and cannot control the flow of data to or from the AboveNet Network and other portions of the Internet. Such flow depends in large part on the performance of Internet services provided or controlled by third parties. At times, actions or inactions caused by these third parties can produce situations in which Customer connections to the Internet (or portions thereof) may be impaired or disrupted. It cannot be guaranteed that such situations will not occur and, accordingly, MFN disclaims any and all liability resulting from or related to such events. In the event that Customer's use of the Services or interaction with the Internet or such third parties is causing harm to or threatens to cause harm to the AboveNet Network or its operations, MFN shall have the right to suspend the Service. MFN shall restore Service at such time as it reasonably deems that there is no further harm or threat of harm to the AboveNet Network or its operations.

6. Limitations of Liability.

6.1 Exclusions. In no event will MFN be liable for any incidental, punitive, indirect or consequential damages (including without limitation any lost revenue or lost profits) or for any loss of technology, loss of data, or interruption or loss of use of Service (except as set forth in any applicable Service Level Agreement) or any other similar type, to Customer or related to Customer's business, even if MFN is advised of the possibility of such damages.

6.2 Maximum Liability. Notwithstanding anything to the contrary in this Agreement, MFN's maximum aggregate liability to Customer related to or in connection with this Agreement whether under theory of contract, tort (including

negligence), strict liability or otherwise will be limited to the total amount due to MFN from Customer hereunder for the first twelve (12) month period of the Agreement.

**7. Indemnification.**

7.1 Covered Claims. Each party (the "Indemnifying Party" for purposes of this Section) will indemnify, defend and hold harmless the other party (the "Indemnified Party"), its directors, officers, employees, and affiliates (collectively, the "Indemnified Entities") from and against any and all claims, actions or demands brought against any of the Indemnified Entities alleging: (a) infringement or misappropriation of any intellectual property rights by the Indemnifying Party except to the extent caused by the Indemnified Party; (b) defamation, libel, slander, obscenity, pornography, or violation of the rights of privacy or publicity, or spamming or any other tortious or illegal conduct; (c) any property loss suffered by any other customer of MFN resulting from acts or omissions by the Indemnifying Party or its representative(s) or designees; or (d) any personal injury suffered by any representative, employee or agent of the Indemnified Party arising out of such individual's activities related to the Services except to the extent caused by the Indemnified Party's negligence or willful misconduct (collectively, the "Covered Claims").

7.2 Notice Procedure. The Indemnified Party will provide the Indemnifying Party with prompt written notice of each Covered Claim of which the Indemnified Party becomes aware. At the Indemnified Party's sole option, it may elect to participate in the defense and settlement of any Covered Claim, provided that such participation shall not relieve the Indemnifying Party of any of its obligations under this Section. The Indemnifying Party shall have the right to control the defense of any Covered Claim.

**8. Term.** This Agreement will commence on the Effective Date and will expire upon the expiration of all Service Orders hereunder, unless sooner terminated as provided herein. Each Service Order will have the term specified therein, and will automatically renew for additional one-year terms unless Customer notifies MFN in writing prior to the expiration of the then-current term that it has elected to terminate the Services under such Service Order at the end of such term.

**9. Termination.**

9.1 Nonpayment. In addition to its rights under Section 9.3 below, MFN may suspend service to Customer if Customer is in default of its payment obligations hereunder. Reinstatement of Services may involve costs, for which a reconnection fee may be required.

9.2 Bankruptcy. Either party may terminate this Agreement upon written notice to the other party if such other party becomes the subject of a petition in bankruptcy or any proceeding relating to insolvency, receivership, or liquidation for the benefit of creditors, if such petition or proceeding is not dismissed within 60 days of filing.

9.3 Breach. Except as otherwise stated, either party may terminate this Agreement if the other party breaches any material term or condition of this Agreement and fails to cure such breach within ten (10) days after receipt of written notice of the same.

9.4 Effect of Termination. Upon expiration or termination of this Agreement (a) MFN will cease providing the Services; (b) except in the case of termination by Customer pursuant to Section 9.3, all of Customer's payment obligations under this Agreement, including but not limited to the Service Charges through the end of the Term (indicated on the Service Order(s)) will become due in full immediately; and (c) MFN reserves the right to restrict Customer's physical access to the equipment in any facility of MFN and to hold such equipment securely until payment in full has been received or until such equipment is taken in full or partial satisfaction of any lien or judgment.

**10. Survival.** The Parties' respective representations, warranties, and covenants, together with obligations of indemnification, confidentiality and limitations on liability will survive the expiration, termination or rescission of this Agreement and continue in full force and effect.

**11. Miscellaneous Provisions.**

11.1 Force Majeure. Other than with respect to failure to make payments due, neither party shall be liable under this Agreement for delays, failures to perform, damages, losses or destruction, or malfunction of any equipment, or any consequence thereof, caused or occasioned by, or due to fire, earthquake, flood, water, the elements, labor disputes or shortages, utility curtailments, power failures, explosions, civil disturbances, governmental actions, shortages of equipment or supplies, unavailability of transportation, acts or omissions of third parties, or any other cause beyond its reasonable control.

11.2 Confidentiality. Each party agrees that all information furnished to it by the other party, or information of the other party to which it has access under this Agreement, shall be deemed the confidential and proprietary information (collectively referred to as "Confidential Information") of the Disclosing Party and shall remain the sole and exclusive property of the Disclosing Party (the party furnishing the Confidential Information referred to as the "Disclosing Party" and the other Party referred to as the "Receiving Party"). Each party shall treat the Confidential Information and the contents of this Agreement in a confidential manner, shall use such information only to the extent necessary to perform

its obligations hereunder, and, neither party may directly or indirectly disclose the same to anyone other than its employees on a need to know basis and who agree to be bound by the terms of this Section, without the written consent of the Disclosing Party. Information will not be deemed Confidential Information hereunder if such information: (i) is known to the Receiving Party prior to receipt from the Disclosing Party directly or indirectly from a source other than one having an obligation of confidentiality to the Disclosing Party; (ii) becomes known (independently of disclosure by the Disclosing Party) to the Receiving Party directly or indirectly from a source other than one having an obligation of confidentiality to the Disclosing Party; (iii) becomes publicly known or otherwise ceases to be secret or confidential, except through a breach of this Agreement by the Receiving Party (iv) is independently developed by the Receiving Party; or (v) is required to be released by law or regulation, provided that the Receiving Party provide prompt written notice to the Disclosing Party of such impending release, and the Receiving Party cooperate fully with the Disclosing Party to minimize such release.

11.3 Marketing. . Each party may use the other's name, logo and other trademarks in marketing documents and press releases subject to that other party's prior written approval, and subject to trademark usage and other guidelines that may be provided. All goodwill associated with each party's respective trade name, trademarks, slogans and logos will inure solely to that party.

11.4 Government Regulations. Customer will not export, re-export, transfer, or make available, whether directly or indirectly, any regulated item or information to anyone in connection with this Agreement without first complying with all export control laws and regulations which may be imposed by any government within whose jurisdiction Customer operates or does business.

11.5 Assignment. Neither party may assign its rights or delegate its duties under this Agreement either in whole or in part without the prior written consent of the other party, except to an affiliate or a party that acquires substantially all of the assigning party's assets or a majority of its stock as part of a corporate merger or acquisition. Any attempted assignment or delegation without such consent will be void. This Agreement will bind and inure to the benefit of each party's successors and permitted assigns.

11.6 No Resale. Customer may not resell the Services. For purposes of this Section, the provisioning of web hosting on Customer's equipment and/or ISP service is not considered reselling the Services. Customer hereby indemnifies MFN against any harm or any claims arising out of acts or omissions of any customers of Customer or other third parties using Customer's equipment or service that is the subject of this Agreement.

11.7 Notices. Any required notice hereunder may be delivered personally or by courier, or mailed by registered or certified mail, return receipt requested, postage prepaid, to either party at the name and address on the signature page of this Agreement, or at such other address as each party may provide to the other by written notice. Such notice will be deemed to have been given as of the date it is delivered personally or by courier, or five (5) days after it is sent by mail. In addition, AboveNet shall have the right to send Customer notices, other than notices for default of termination, to Customer's email address as contained in AboveNet's customer contact list. Such email notification is deemed delivered on the day sent unless returned to sender.

11.8 Relationship of Parties. This Agreement will not establish any relationship of partnership, joint venture, employment, franchise or agency between the parties.

11.9 Changes Prior to Execution. Each party represents and warrants that any changes to this Agreement made by it were properly marked as changes and that it made no changes to the Agreement that were not properly identified as changes.

11.10 Choice of Law. This Agreement will be governed by and construed in accordance with the laws of the State of New York, excluding its conflict of laws principles.

12. General. This Agreement, together with the Service Order(s), Quotation for Services, Service Level Agreement(s) and Exhibit(s) (including the policies referred to therein) is the complete agreement and understanding of the parties with respect to the subject matter hereof, and supersedes any other agreement or understanding, written or oral including the Internet Services and Co-Location Agreement between M. Shankar Communications and AboveNet effective August 8, 1999. This Agreement may be modified only through a written instrument signed by both parties. Should any provision of this Agreement be declared void or unenforceable, such provision will be deemed amended to achieve as nearly as possible the same economic effect as the original terms and the remainder of this Agreement will remain in full force and effect. If a conflict arises between a party's pre-printed business form and this Agreement or between a Service Order and this Agreement, this Agreement will take precedence.

End of Internet Services Agreement

MShankarfinalv1.0/MShankarv1.0
MSA 01 6-12

4

### Addendum: AboveNet Co-Location Terms

1. **Use of Space.** Customer may use the AboveNet Co-location Space only for the purposes of maintaining and operating computer equipment as necessary to support links to the AboveNet Network and from there to third parties.

2. **Customer Equipment.** Except as otherwise provided herein, Customer is responsible for all aspects of installation and removal of its equipment, including bringing appropriate related equipment, tools and packaging materials. Customer will install its equipment in the AboveNet Co-location Space after obtaining the appropriate authorization from MFN to access the premises. Customer will remove all packaging for its equipment promptly after installation. Should Customer use an agent or other third party to deliver, install or remove its equipment, Customer will be solely responsible for the acts of such party. At Customer's option, MFN will remove and package Customer's equipment and place it in a designated area for pick-up, on the condition that Customer either provide or pay for all needed packaging plus pay MFN's packaging fees and charges. Within five (5) days after authorization from MFN, Customer will remove its equipment from the designated area or arrange on a pre-paid basis for a carrier to pick-up and ship such equipment to Customer. Within ten (10) days after any termination of the Services, Customer will remove all of its equipment and any other property from MFN's premises and return the AboveNet Co-location Space in the same condition as it was prior to Customer installation. If Customer does not remove such property within the ten (10) day period, MFN, at its option and at Customer expense, may remove and store any and all such property, return such equipment to the Customer, or dispose of such equipment without liability for any related damages. Notwithstanding the foregoing, MFN reserves the right to deny Customer the right to remove Customer equipment from the Co-Location facility in the event Customer is not current in the payment of its obligations hereunder. Except as specifically provided herein, Customer expressly assumes all risk or loss to its equipment in the AboveNet Co-location Space. Customer shall be liable to MFN for any damage to the AboveNet Co-location Space or equipment of MFN or its other customers caused by Customer, Customer's equipment or Customer's representatives, agents or employees.

3. **Security and Lease Procedures.** Customer may access the AboveNet Co-location Space only in accordance with the AboveNet Co-location Security and Access Procedure set forth at the AboveNet website, as updated from time to time, subject to notice to Customer of any material changes. MFN reserves the right to suspend for good cause the right of any of Customer employees, agents or representatives to visit and/or access the AboveNet Co-location Space and related premises, based on such employees', agents' or representatives' conduct. It is Customer's responsibility to ensure that Customer's access list is current and accurate. Customer shall be responsible for any unauthorized access to its equipment through the Internet and any resulting use of Service.

4. **Cross Connects.** Customer connections to anything inside the Co-location other than the AboveNet Network is subject to approval by MFN. Customer connections may not be used to (i) provide services inside the Co-location facility that are competitive to the Internet services provided by MFN inside, or by connections to, the Co-location facility, or (ii) assist others to provide such services. Use of any such connection is subject to audit by MFN, who reserves the right to suspend any connection found to be in violation of the foregoing. Customer is responsible for ordering, maintaining, terminating and paying for any approved cross-connects or other circuits provided to Customer.

5. **No Lease.** This Agreement is a services agreement and is not intended to and will not constitute a lease of or tenancy or other interest in the Co-location Space or other MFN premises, any equipment or any other real or personal property.

6. **Insurance.** Customer will keep in full force and effect during the term of this Agreement (i) commercial general liability insurance in an amount not less than one million dollars ($1,000,000) per occurrence for bodily injury and property damage; (ii) employee's liability insurance in an amount not less than one million dollars ($1,000,000) per occurrence; and (iii) workers' compensation insurance in an amount not less than that required by applicable law. Customer also agrees that it will be solely responsible for ensuring that its agents (including contractors and subcontractors) maintain other insurance at levels no less than those required by applicable law and customary in Customer's and its agents' industries. Prior to installation of any equipment in the Co-location Space or otherwise as MFN may request, Customer will furnish MFN with certificates of insurance which evidence the minimum levels of insurance set forth above, and will cause its insurance MFN(s) to name MFN as an additional insured and notify MFN in writing of the effective date of such coverage.

### Addendum: AboveNet Bandwidth Terms.

1. Acceptable Use; SPAM. Customer will at all times comply with and conform its use of the Service to the AboveNet Acceptable Use Guidelines and AboveNet Anti-SPAM Policy set forth at the AboveNet website, as updated from time to time, subject to notice to Customer of any material changes. In the event Customer violates the AboveNet Acceptable Use Guidelines where MFN determines in its reasonable discretion that there is potential harm to its Network or business, MFN shall have the right to immediately suspend Service. In other cases of violation of the AboveNet Acceptable Use Guidelines and AboveNet Anti-SPAM Policy, MFN will provide notice and opportunity to cure, to the extent MFN deems reasonably appropriate, depending on the nature of the violation, the availability of the Customer and whether or not there has been a repeat violation. MFN, in its reasonable discretion, shall re-enable the Service upon satisfaction that all violations have ceased and with adequate assurance that such violations will not occur in the future.

2. Illegal Use. Customer will cooperate in any investigation of Customer's alleged illegal use of MFN's facilities or other networks accessed through the AboveNet Network. If Customer fails to cooperate with any such investigation, MFN may suspend Customer's Service. Additionally, MFN may modify or suspend Customer's Service in the event of illegal use of the AboveNet Network or as necessary to comply with any law or regulation, including the Digital Millennium Copyright Act of 1998, 17 U.S.C. 512, as reasonably determined by MFN.

3. Other Networks. Customer is responsible for paying any fees, obtaining any required approvals and complying with any laws or usage policies applicable to transmitting data beyond the AboveNet Network and/or through other public and private networks. MFN is not responsible or liable for performance or non-performance of such networks or their interconnection points.

**Addendum: AboveNet Virtual ISX Terms**

1. **Customer Rights and Responsibilities.**

1.1 **Access to Customer Premises.** Customer must obtain all necessary third-party approval for access by MFN into the Customer Premises set forth on the Service Order. Specifically and without limitation, Customer shall obtain approval for external access by MFN (permission to build a fiber/fiber conduit connection into the building) and/or for bringing riser conduit or other inside plant facilities into the Customer Premises (as defined on the Service Order). Such approval must extend to installation, maintenance and retrieval of such fiber, conduit and other inside plant facilities. Customer will pay all fees, recurring and non-recurring, assessed by any building owner, landlord or other third party for the necessary approval and permission to access or build into a Customer Premises. In the event that Customer has failed to obtain such approvals at least 5 days prior to the Estimated Activation Date for the Service Order, MFN shall have the right to begin billing Customer for Services on the later to occur of the Estimated Activation Date or the date on which MFN has installed fiber to point of entry or the last serving manhole outside the Customer Premises. Customer shall provide MFN with access to MFN's equipment in the Customer Premises on 2 hours notice.

1.2 **Provision of Space.** Customer shall furnish MFN space within the Customer Premises necessary to operate MFN's equipment in the Customer Premises. Customer Premises shall meet or exceed the specifications set forth below. Customer shall furnish MFN access to the Customer Premises and MFN's equipment at all times as MFN deems necessary to operate and service the AboveNet equipment.

1.3 **AboveNet Equipment.** Customer shall not and shall not permit its employees, agents, contractors or other third parties to disconnect, interfere with, operate, modify or attempt to service MFN's equipment on the Customer Premises. MFN or its agents will perform all maintenance and repairs to its Equipment and the AboveNet Network at no additional charge to Customer, unless such maintenance or repair was necessary as a result of Customer's actions. Customer shall be liable for all damage to the AboveNet Network or equipment resulting from its negligence or intentional misconduct, or violation of this Section.

1.4 **Authorizations.** MFN will use commercially reasonable efforts to obtain, maintain or renew all Authorizations throughout the Term. If any modification or termination of or failure to obtain an Authorization prevents or materially interferes with MFN's control, possession and/or use of the AboveNet Network or its ability to provide the Services then MFN shall have the right, to the extent such event affects the provision of the Services, to terminate this Agreement with respect to the affected Services without further obligation or liability to Customer. The foregoing is MFN's sole and exclusive liability and Customer's sole and exclusive remedy with respect to termination as a result of the loss of an Authorization. "Authorization(s)" means all material and applicable authorizations, leases, licenses, easements, rights of way, franchises, approvals, permits, orders, consents, and all other rights required for MFN to operate and maintain the AboveNet Network.

2. **Virtual ISX Service Description and Requirements.**

2.1 **Virtual ISX Network Description.** The network provided consists of:

- Network connection allows from up to 1 Gigabit to Multi-Gigabits of Internet capacity. Maximum bandwidth is set forth in the Service Order. A dark fiber ring (2 fibers), with dual building entrance; connecting 'customer location' and 'connecting ISX' unless otherwise specified in the Service Order.

- The dark fiber will terminate into a MFN-managed WDM system that will reside on the customer premises.

- Client interface is Gigabit Ethernet. Either a multimode fiber connection (850nm) or singlemode fiber connection (1310 nm). SC connector required (customer provided). MFN will install a patch panel for client connection.

Network Design Option: Customer has two redundancy options, Customer must choose one.

- Layer 1 Protection – single client connection; protection or restoration at optical layer.

- Layer 3 Protection – dual client connection; protection or restoration at IP layer via dynamic routing protocol.

2.2 **Customer Requirements.** MFN will install, monitor and manage MFN's equipment on the Customer Premises. The customer will be required to furnish MFN:

- Site Access    24 x 7 access to the Customer Premises to install and maintain MFN's equipment

- Space:    Customer will be required to provide adequate space for MFN's equipment on the Customer Premises.

- **Power:** Customer will be required to provide adequate power for MFN's equipment on the Customer Premises. MFN will install two power supplies for redundant load sharing power.

- **Mounting:** The remaining device is designed to fit on standard mounting racks—either telco style or 19 in equipment racks. To be installed in properly ventilated areas by maintaining a minimum clearance of 6 inches in front and rear of the unit. Allow for 24 inches of clearance in front of the unit for the installation, maintenance and replacement of modules.

- **Environmental:** Temperature: Operating: 32 to 104° F (0 to 40° C) continuous, 23 to 131°F (-5 to 55°C) for 96 hrs., NEBS level 3 compliant.

  Humidity: Operating, non-condensing 10 to 90%

**2.3 Installation.** MFN and/or its agents will install MFN's equipment required to deliver the Service, subject to a Service Activation Charge as specified in the Service Order.

**2.4 Monitoring.** MFN will monitor all fiber and MFN equipment comprising the Service, 24 hours a day, 365 days a year, for the duration of the Term.

**2.5 Upgrades.** Subject to remaining capacity, Customer may request changes and upgrades to the Service. All changes and upgrades will automatically be made part of the then-current pricing.

- Change of Redundancy Protection Option. Customer may change redundancy protection option from Layer 1 Protection to Layer 3 Protection or visa versa. Installation and Monthly Service Charges will apply.

- Addition of a Gigabit Ethernet wavelength channel to an existing network. Installation and Monthly Service Charges apply.